841 F.2d 486
 6 U.S.P.Q.2d 1187
 BANFF, LTD., f/k/a Sweater Bee by Banff, Ltd., Plaintiff-Appellant,
v.
FEDERATED DEPARTMENT STORES, INC., and Bloomingdale's, a
division of Federated Department Stores, Inc.,
Defendant-Appellee.
 No. 262, Docket 87-7439.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 19, 1987.
Decided March 10, 1988.
 
 Dennis Grossman, New York City (Eileen King, New York City, of counsel), for plaintiff-appellant.
 Karen Artz Ash, New York City (Daniel Ebenstein, Amster, Rothstein & Ebenstein, New York City, of counsel), for defendant-appellee.
 Before OAKES, CARDAMONE and MAHONEY, Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 This is an appeal in a Lanham Act case. In the typical trademark infringement suit a senior user claims that a junior user is attempting to ride on the senior's coattails and to persuade consumers that the senior user is the source of the junior user's goods. On this appeal, we consider what the rule is when the junior user--because it is bigger and better known in the marketplace--is wrongly viewed as the source of the goods in question.
 
 BACKGROUND
 
 2
 Recognizing that suits for trademark infringement demand a "comprehensive analysis of all the relevant facts and circumstances," Vitarroz Corp. v. Borden, Inc., 644 F.2d 960, 968 (2d Cir.1981), we begin with a brief summary of the facts. Banff Ltd. (Banff) is a New York corporation engaged in the manufacturing, marketing, and sale of a wide range of quality women's clothing. Since 1971 Banff has marketed a successful line of apparel under the unregistered trademark "Bee Wear" to retail stores that in turn sell "Bee Wear" to retail consumers. Beginning in the 1930's Bloomingdale's--an internationally renowned department store in business since 1872--has used the letter "B" by itself and in combination with other words to promote its goods and business. Its use of the letter "B" during this period has been limited to three predominant styles: first, the long-used capital "B" with a "flowing romantic shape" and three-dimensional shading, which we call the "ribbon-style 'B' "; second, a "standard typestyle 'B' "; and third, a more recently introduced lower case "b" with a "modern design distinguished by its simplicity, ... comprised of an unadorned loop and upstroke" which we refer to as the "stylized lower-case 'b.' " The stylized letters also have been used as prefixes for various ordinary words, e.g., "b-Way."
 
 
 3
 Bloomingdale's presents two examples of its use of "B" in composite with "Wear": one involving the standard typestyle "B Wear" and one involving the ribbon-style "B Wear." It opened a junior wear department in August 1982 called the "B Wear" Department (standard typestyle "B"). There is no claim that this is a protected trademark use. "B Wear" was only displayed on the junior wear department signs, that is, not on the goods themselves. Bloomingdale's further notes that only two of its stores presently display the "B Wear" sign. It also produced evidence that for a short period it used a ribbon-style "B Wear" to designate its internal dress regulations for its employees. This too is not a trademark use of "B Wear." Apart from these two uses, there is no evidence that before 1986 Bloomingdale's made any use of "B Wear."
 
 
 4
 In 1986 Bloomingdale's began manufacturing and selling women's clothing of the same general style and quality as Banff's clothing using the standard typestyle "B Wear." This clothing was sold to consumers through its retail stores. Stores that carry Banff's "Bee Wear" and those that carry Bloomingdale's standard typestyle "B Wear" are generally thought to be competitors. Banff had no previous knowledge of Bloomingdale's introduction of its standard typestyle "B Wear" label, and did not consent to it.
 
 
 5
 As soon as Banff became aware of Bloomingdale's use of the mark "B Wear," it commenced the instant action on May 7, 1986 in the United States District Court for the Southern District of New York (Sweet, J.) against Federated Department Stores, Inc. and its Bloomingdale's division seeking to enjoin Bloomingdale's use of a false designation of origin in violation of the Lanham Act, 15 U.S.C. Sec. 1125(a) (1982).[1] Shortly thereafter Banff sought a preliminary injunction prohibiting Bloomingdale's from using the mark "B Wear" in connection with the sale of women's apparel, which Banff alleged infringed its prior use of the unregistered trademark "Bee Wear." In a published opinion dated June 5, 1986 and an order dated June 23, 1986 Judge Sweet granted Banff's preliminary injunction. Banff, Ltd. v. Federated Dep't Stores, Inc., 638 F.Supp. 652 (S.D.N.Y.1986).
 
 
 6
 In its preliminary injunction opinion, the district court compared the marks "Bee Wear" and standard typestyle "B Wear," which at the time was attached to approximately 87,000 units of sold merchandise and $3 million (retail price) of unsold (ordered or displayed) Bloomingdale's goods. 638 F.Supp. at 654. After finding that "Bee Wear" merited protection and that a likelihood of success on the likelihood of confusion issue existed, the district court in its June 23 order preliminarily enjoined Bloomingdale's from using the standard typestyle "B Wear" trademark or trade name--or any designation confusingly similar to "B Wear" or "Bee Wear"--in connection with the sale, marketing, or advertising of women's clothing. Even at that stage of the proceedings, Bloomingdale's had stated that it intended to change the print style used on the "B Wear" labels, substituting a stylized lower-case "b" for the standard typestyle "B." Id. at 658.
 
 
 7
 The district court specifically refused to prohibit Bloomingdale's proposed use of stylized lower-case "b Wear." This holding was premised upon its findings that the visual similarity of the two marks would be largely eliminated by using the stylized lower-case "b"; that Bloomingdale's might have a protectible interest in this stylized "b"; and that the use of this recognizable "b" on Bloomingdale's private line in its own stores would reduce the likelihood of confusion by sophisticated customers. Id.
 
 
 8
 Subsequent to the entering of this narrow preliminary injunction, Bloomingdale's reasserted its intention to use after final judgment its proposed stylized lower-case "b Wear" label, and argued that it should be expressly allowed to use this stylized lower-case "b Wear" and a ribbon-style "B Wear." In an opinion dated March 31, 1987--which incorporated the findings and analysis of its preliminary injunction opinion--the district court permanently enjoined Bloomingdale's from using the standard typestyle "B Wear." Again excluded from the scope of the injunction was Bloomingdale's use of a stylized lower-case "b Wear" and excluded for the first time was Bloomingdale's use of a ribbon-style "B Wear." The district judge also denied Banff's request for attorneys' fees pursuant to 15 U.S.C. Sec. 1117(a) (1982 & Supp. IV 1986) upon finding that the case is not an "exceptional" one meriting such an award.
 
 
 9
 From a final judgment and order entered April 30, 1987 reflecting these holdings, Banff appeals. We agree with nearly all that the district court wrote in its careful opinion, differing only as to its refusal to include in the scope of the permanent injunction all contested variations of "B Wear." In our view, the reasoning that leads to the injunction, which we uphold, logically compels an injunction of broader scope.
 
 DISCUSSION
 
 10
 I Eligibility for Protection Under the Lanham Act
 
 
 11
 Section 43(a) of the Lanham Act proscribes the "false designation of origin" by the use of "words or other symbols" in connection with goods or services. 15 U.S.C. Sec. 1125(a) (1982). The Act protects not only registered trademarks, but unregistered marks, such as "Bee Wear," as well. Thompson Medical Co. v. Pfizer Inc., 753 F.2d 208, 212 & n. 5 (2d Cir.1985).
 
 A. Kind of Mark
 
 12
 To determine whether an unregistered mark has been infringed, we apply a two-step test. First, plaintiff must demonstrate that its mark merits protection under Judge Friendly's classic formulation in Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4 (2d Cir.1976). Trademarks are divided into four categories with respect to protection. "Arrayed in an ascending order which roughly reflects their eligibility to trademark status and the degree of protection accorded, these classes are (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." Id. at 9. Before beginning analysis, we must acknowledge that placing a mark in one of these four categories is far from an exact science, and that the differences between the classes, which is not always readily apparent, makes placing a mark in its proper context and attaching to it one of the four labels a tricky business at best. See 20th Century Wear Inc. v. Sanmark Stardust Inc., 747 F.2d 81, 87 & n. 6 (2d Cir.1984).
 
 
 13
 Generally, generic terms--a common description of goods like "aspirin" for example--are ineligible for trademark protection. Abercrombi & Fitch, at 9-10. Arbitrary marks are eligible for protection without proof of secondary meaning and "with ease of establishing infringement." Id. at 11. Recognizing that the determination of similarity of marks discussed below involves comparison of the marks as composites--not as isolated components--the district court properly determined at the preliminary injunction stage that Banff's use of the mark "Bee Wear" combines both an arbitrary and a generic term, resulting in a suggestive or arbitrary mark entitled to copyright protection. 638 F.Supp. at 655; see 2 T. McCarthy, Trademarks and Unfair Competition Sec. 23:15(G) (2d ed. 1984).
 
 
 14
 Consequently, we turn to the second step in examining infringement, determining whether Bloomingdale's mark is likely to cause confusion with Banff's mark.
 
 B. Likelihood of Confusion
 
 15
 If its mark is entitled to protection, a plaintiff must then establish likelihood of confusion by proving "that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." Mushroom Makers, Inc. v. R.G. Barry Corp., 580 F.2d 44, 47 (2d Cir.1978) (per curiam), cert. denied, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). The trial court determines "likelihood of confusion" by evaluating many factors, including but not limited to
 
 
 16
 the strength of [plaintiff's] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers.
 
 
 17
 Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir.), cert. denied, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). Originally formulated to assess confusion of noncompeting products, Polaroid 's test now extends to competing products as well. Thompson Medical Co., 753 F.2d at 214. The weighing of these Polaroid factors, none individually dispositive, should support the trial court's ultimate conclusion regarding infringement. See Lever Bros. Co. v. American Bakeries Co., 693 F.2d 251, 253 (2d Cir.1982). Additionally, "each factor must be evaluated in the context of how it bears on the ultimate question of likelihood of confusion as to the source of the product." Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867, 872 (2d Cir.1986).
 
 
 18
 At the outset, we note that Banff only appeals with respect to the scope of the injunction granted. It claims that the trial court erred in refusing to extend the injunction to Bloomingdale marks utilizing the ribbon-style "B" and the stylized lower-case "b". In so arguing, however, Banff claims that the lower court made clearly erroneous findings as to several Polaroid factors, thus necessitating our review of the lower court's application of the Polaroid test. Of course, Banff argues that any such errors below are germane only insofar as they precluded extension of the injunction. Bloomingdale's does not cross-appeal the granting of the injunction below as to the mark utilizing the standard typestyle "B".
 
 
 19
 In reviewing the trial court's application of the Polaroid factors each specific finding is subject to a clearly erroneous standard, but the ultimate determination of the likelihood of confusion is a legal issue subject to de novo appellate review. See Centaur Communications, Ltd. v. A/S/M Communications, Inc., 830 F.2d 1217, 1225 (2d Cir.1987); Plus Prods. v. Plus Discount Foods, Inc., 722 F.2d 999, 1004-05 (2d Cir.1983).
 
 
 20
 Before considering the various Polaroid findings made by the trial court it is helpful to the discussion to describe the type of confusion Banff alleges. Subsumed under the likelihood of confusion analysis, two types of potential confusion allegedly support a claim of infringement: ordinary confusion and reverse confusion. Under the Lanham Act confusion is ordinarily the misimpression that the senior user (Banff) is the source of the junior user's (Bloomingdale's) goods. Reverse confusion is the misimpression that the junior user is the source of the senior user's goods. 2 T. McCarthy, supra, at Sec. 23:1(E).
 
 
 21
 The principal marks in question, "Bee Wear" and various typestyles of "B Wear," may create both types of confusion. Consumers who know of Banff's "Bee Wear" may believe that Bloomingdale's standard typestyle "B Wear," ribbon-style "B Wear," or stylized lower-case "b Wear" goods originate with Banff. The Lanham Act protects against this kind of confusion in order to prevent Bloomingdale's from appropriating Banff's reputation, limiting Banff's expansion, or causing Banff a loss of patronage. See Vitarroz Corp., 644 F.2d at 967. Other consumers initially aware of Bloomingdale's apparel may believe that Banff's "Bee Wear" mark they later encounter originates with Bloomingdale's. These consumers may consider Banff an unauthorized infringer, and Bloomingdale's use of the mark may in that way injure Banff's reputation and impair its good will. See 2 T. McCarthy, supra, at Sec. 23:1(E). Thus, reverse confusion also inhibits fair competition and deprives Banff of its reputation and good will.
 
 
 22
 Although implicitly recognizing that reverse confusion is actionable, see Lobo Enters., Inc. v. The Tunnel, Inc., 822 F.2d 331, 333 (2d Cir.1987); Plus Products, 722 F.2d at 1003-04, 1004 n. 6, we have not had occasion to hold explicitly that a likelihood of reverse confusion warrants an injunction under the Lanham Act. The objectives of that Act--to protect an owner's interest in its trademark by keeping the public free from confusion as to the source of goods and ensuring fair competition--are as important in a case of reverse confusion as in typical trademark infringement. Were reverse confusion not a sufficient basis to obtain Lanham Act protection, a larger company could with impunity infringe the senior mark of a smaller one. See Plus Products, 722 F.2d at 1003-04 (senior user's reputation for high quality merchandise may be tarnished by prominent junior user's "bargain basement" image). Consequently, we hold that reverse confusion--perhaps the primary type of confusion involved in this case--is actionable under Sec. 43(a) of the Lanham Act.
 
 Strength of the Mark
 
 23
 We turn now to a consideration of the Polaroid factors. The first Polaroid factor--the strength of the mark--is "its tendency to identify the goods sold under the mark as emanating from a particular ... source." McGregor-Doniger Inc. v. Drizzle Inc., 599 F.2d 1126, 1131 (2d Cir.1979). Although the category in which the mark qualifies--generic, descriptive, suggestive, or arbitrary--is useful in determining its strength, it is not dispositive: "the strength of a mark depends ultimately on its distinctiveness, or its 'origin-indicating' quality, in the eyes of the purchasing public." Id.
 
 
 24
 Characterizing the mark "Bee Wear" as a composite of arbitrary and generic terms which, taken as a whole, comprises a suggestive or arbitrary mark, the trial court compared the nongeneric terms of the marks, "Bee" and "B," and concluded that the mark "Bee Wear" is "a rather weak mark." 638 F.Supp. at 655. Banff's mark, the district judge reasoned, is not a strong indicator of origin because numerous nonparties use "Bee" in conjunction with other words constituting marks for retail clothing. Id. But it found no nonparty users of "Bee Wear."
 
 
 25
 The trial court's opinion handed down with the issuance of the permanent injunction did not reevaluate the strength of the mark at issue; it simply incorporated the above findings that it had made earlier in connection with the preliminary injunction. Its insistence on comparing the marks as composites and on comparing each mark's overall impression when viewed separately in the context of the second Polaroid factor--similarity of marks--cuts against its initial finding of weakness premised on comparing only the nongeneric terms. As the district court stated in its permanent injunction opinion, "restricting comparison of the two marks to "Bee" and "B," the non-generic terms of the trademarks, for purposes of determining both similarity and priority ... is contrary to logic and the prevailing authorities."
 
 
 26
 We believe the marks should be compared as composites for the purpose of determining the strength of the senior user's mark. The long-standing view that the nongeneric components of a mark must be compared in the context of the overall composite mark, see 2 T. McCarthy, supra, Sec. 23:15(G), at 89, remains the rule in this Circuit. Cf. American Cyanamid Corp. v. Connaught Laboratories, Inc., 800 F.2d 306, 309 (2d Cir.1986) (HibVAX does not infringe HIB-IMUNE because dissimilarity of suffixes offsets identity of prefixes); American Home Prods. Corp. v. Johnson Chem. Co., 589 F.2d 103, 107 (2d Cir.1978) (ROACH INN presents same concept to consumers as ROACH MOTEL).
 
 
 27
 With this rule clarified, we nevertheless decline to disturb the district court's finding that "Bee Wear" is a weak mark. We say this for three reasons. First, the finding that "Bee Wear" is weak is not clearly erroneous, despite the erroneous analysis of the component "Bee" viewed in isolation. Second, finding the mark strong, or somewhere between strong and weak, is not necessary for the district court's ultimate holding of a likelihood of confusion between "Bee Wear" and "B Wear." Finally, our expansion of the scope of the injunction does not depend on a finding that "Bee Wear" is a strong mark.[2] For these reasons, the finding of the strength of plaintiff's mark remains intact.
 
 Similarity of the Marks
 
 28
 As the district court recognized, the test for determining this factor is whether the labels create the " 'same overall impression' " when viewed separately. Paco Rabanne Parfums, S.A. v. Norco Enters., Inc., 680 F.2d 891, 893 (2d Cir.1982) (quoting RJR Foods, Inc. v. White Rock Corp., 603 F.2d 1058, 1060 (2d Cir.1979)). It noted that the similarities between standard typestyle "B Wear" and "Bee Wear" are "so obvious and strong" that the marks clearly create the same overall impression to retail consumers. 638 F.Supp. at 655. This finding was reinforced by reference to the striking oral and visual similarities between them. Id. at 655-56. Additionally, the trial judge commented that the similarity of typefaces--each using a Roman letter design for the label--exacerbates the like impression created by the two labels. Beyond this, Bloomingdale's attachment of its company name below its standard typestyle "B Wear" mark does not offset the marks' similarity because the name is in very small letters and may actually increase the misappropriation by linking defendant's name to plaintiff's goodwill. Id.
 
 
 29
 The district judge devoted a major portion of his March 31, 1987 opinion--granting a permanent injunction in part--to re-evaluating the similarity of the marks factor in light of American Cyanamid Corp. v. Connaught Laboratories, Inc., 800 F.2d 306 (2d Cir.1986). Applying the Paco Rabanne test of overall impression, the district judge stated that "Bee Wear" and "B Wear" must be compared as composites. Connaught only mandates that a finding of infringement cannot rest solely on the use of the same generic term when the other terms are dissimilar. 800 F.2d at 308; see 2 T. McCarthy, supra, at Sec. 23:15(G). For the reasons set forth in both of Judge Sweet's opinions, we affirm his findings regarding the similarity of the marks.
 
 
 30
 Proximity of the Products and Bridging the Gap
 
 
 31
 Again, the district court correctly analyzed proximity and bridging the gap. As it found, "the products on which the marks are used are competitive and ... there is no gap to be bridged" between them. 638 F.Supp. at 656. To establish likelihood of confusion, competing goods require less proof under the Polaroid factors than noncompetitive items. See Plus Products, 722 F.2d at 1008-09; Kiki Undies Corp. v. Promenade Hosiery Mills, Inc., 411 F.2d 1097, 1100 (2d Cir.1969), cert. dismissed, 396 U.S. 1054, 90 S.Ct. 707, 24 L.Ed.2d 698 (1970). Thus, these findings weigh strongly in Banff's favor and magnify the other factors' weights under the Polaroid analysis.
 
 
 32
 Quality of the Product and Buyers' Sophistication
 
 
 33
 We agree with the parties and the district court that the parties' products are similar in quality. 638 F.Supp. at 657. In this case, the similarity of the products does "tend[ ] to increase the likelihood of confusion" despite the apparent lack of injury to Banff's reputation. Id.; cf. Plus Products, 722 F.2d at 1006 (difference in quality of noncompeting goods "reduces rather than increases the likelihood of confusion"). All agreed that the buyers of the parties' products are relatively sophisticated. But "where the products are identical and the marks are identical, the sophistication of buyers cannot be relied on to prevent confusion." See McGregor-Doniger, 599 F.2d at 1137. Hence, because both parties produce lines of quality apparel under strongly similar marks, this factor does not mitigate the likelihood of confusion.
 
 Actual Confusion and Good Faith
 
 34
 Despite the lack of evidence of actual confusion, the district court recognized that Banff's claim could prevail on the other factors, especially in light of the short duration of Bloomingdale's use of the mark. 638 F.Supp. at 657; see Centaur Communications, 830 F.2d at 1227. In addition, there is no reason to disturb Judge Sweet's finding that overall the good faith factor "does not weigh unequivocally in favor of either party," 638 F.Supp. at 657, even noting his suspicion that Bloomingdale's may not have acted in complete good faith, "which slightly tips the balance in Banff's favor." Id.
 
 
 35
 Based on the foregoing factors and despite the weakness of Banff's mark, the district court held that Banff demonstrated initially a likelihood of success on the merits and then succeeded on the merits in establishing the likelihood of confusion. Id. We could endorse no other conclusion following an application of the Polaroid factors to the marks "Bee Wear" and "B Wear."
 
 II The Scope of the Injunction
 
 36
 The scope of the injunction is the principal issue on appeal. To begin, we note that based on Bloomingdale's intention and ability to sell goods under the stylized lower-case "b Wear" and ribbon-style "B Wear" marks, there is an actual controversy ripe for adjudication. See 2 T. McCarthy, supra, at Sec. 32:18; see also Wembley, Inc. v. Superba Cravats, Inc., 315 F.2d 87, 89 (2d Cir.1963) (justiciability requirements for patent case). Similarly, because Banff did not demonstrate even an uncertain desire to use any mark other than its "Bee Wear" mark, Bloomingdale's counterclaim seeking an injunction against Banff's use of Bloomingdale's two stylized B's in conjunction with "Wear" was properly dismissed. Thus, the single issue concerning the scope of the injunction is whether Bloomingdale's should be enjoined from using either of its stylized B's in conjunction with "Wear" as marks connected to the sale of women's clothing.
 
 
 37
 The district court's permanent injunction rested on its earlier holding concerning the exclusion of the stylized lower-case "b" from the scope of the preliminary injunction. Additionally, because by the permanent injunction stage Bloomingdale's had proposed the exclusion of both of the stylized B's in conjunction with "Wear," the district court also excluded the ribbon-style "B Wear" from the scope of the permanent injunction. Apart from mentioning that both of the stylized B's--when viewed alone--are "distinctive and widely used by Bloomingdale's," the trial court relied on its reasoning in its published June 5 opinion regarding the standard typestyle "B Wear" and declined to undertake further Polaroid analysis.
 
 
 38
 Based on the district court's own reasoning in applying the Polaroid factors to "Bee Wear" and standard typestyle "B Wear," we are unconvinced that simply altering the B's involved--substituting a ribbon-style "B" or a stylized lower-case "b" for a standard typestyle "B"--changes the outcome under Polaroid. Recognizing the duty to view the marks' overall impressions when treated as composites, it is plain that the stylized lower-case "b Wear" and ribbon-style "B Wear" infringe on Banff's "Bee Wear" in exactly the same manner and for precisely the same reasons that the standard typestyle "B Wear" infringes on "Bee Wear." Consequently, the scope of the permanent injunction must be broadened.
 
 
 39
 The scope of the broadened injunction should be made clear. This holding does not affect Bloomingdale's use of a ribbon-style "B" or stylized lower-case "b" in any composite other than with the word "Wear." Similarly, Banff's protected mark in this action is the composite "Bee Wear." Bloomingdale's is accordingly enjoined from using standard typestyle "B Wear," ribbon-style "B Wear," or stylized lower-case "b Wear" in connection with the sale, marketing, or advertising of women's clothing. Although Bloomingdale's has not proposed the use of a standard lower-case "b" in conjunction with "Wear," in our view an application of the Polaroid factors were such use to occur would lead to a similar result.
 
 III Attorneys' Fees
 
 40
 The district court declined to award attorneys' fees. Unlike Centaur Communications, 830 F.2d at 1229, upon which Banff relies, there is no finding here of a deliberate and willful infringement. Instead, Judge Sweet determined that good faith did not weigh "unequivocally" in favor of plaintiff and did not consider this an "exceptional" case meriting such an award under 15 U.S.C. Sec. 1117(a) (Supp. IV 1986). Because awarding attorneys' fees in a Lanham Act suit is discretionary, see id., there must be a showing of an abuse of the district court's discretion which is not present in this record. Absent such a showing, there is no basis to overturn the district court's refusal to make an award. We further decline to award Banff attorneys' fees for this appeal, as it requested.
 
 CONCLUSION
 
 41
 The matter is remanded to the district court to broaden the scope of the injunction it granted in accordance with this opinion. The denial of an award of reasonable attorneys' fees is affirmed.
 
 
 42
 Reversed and remanded in part, affirmed in part.
 
 
 
 [1]
 Banff's pendent claims under New York law for unfair competition and trademark infringement were not addressed by the district court, hence we have no occasion to address them
 
 
 [2]
 Moreover, because the other Polaroid factors support not only a conclusion of likelihood of confusion concerning "B Wear" but also an expansion of the scope of the injunction, the finding of weakness is not essential to the final judgment. Thus the finding of weakness will not be prejudicial in subsequent unrelated proceedings. See Gelb v. Royal Globe Ins. Co., 798 F.2d 38, 44 (2d Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 1608, 94 L.Ed.2d 794 (1987)